IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**BONNIE KNIGHT, ET AL.,**
*Plaintiffs/Appellants*,

*v.*

**ADRIAN FONTES, ET AL.,**
*Defendants/Appellees.*

---

No. CV-24-0220-T/AP
Filed December 4, 2025

---

Appeal from the Superior Court in Maricopa County
The Honorable Frank W. Moskowitz, Judge
No. CV2024000431
**AFFIRMED**

Appeal to the Court of Appeals, Division Two
No. 2 CA-CV 24-0280
**TRANSFERRED**

---

COUNSEL:

Jonathan Riches, Timothy Sandefur, Scott Day Freeman, Parker Jackson, Scharf-Norton Center for Constitutional Litigation at the Goldwater Institute, Phoenix; Andrew W. Gould (argued), Hotlzman Vogel Baran Torchinsky & Josefiak PLLC, Phoenix, Attorneys for Bonnie Knight, et al.

Kristin K. Mayes, Arizona Attorney General, Kara Karlson, Karen J. Hartman-Tellez, Kyle Cummings, Assistant Attorneys General, Phoenix, Attorneys for Adrian P. Fontes

Kristin K. Mayes, Arizona Attorney General, Alexander W. Samuels, Emma H. Mark (argued), Joshua G. Nomkin, Gabriela Monico, Assistant Attorneys General, Phoenix, Attorneys for State of Arizona

———————

JUSTICE BEENE authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ and JUSTICES BOLICK, MONTGOMERY, KING and CRUZ joined.

———————

JUSTICE BEENE, Opinion of the Court:

¶1		In this special action, four Arizona voters challenge the constitutionality of the retention election process for court of appeals judges as set forth in A.R.S. § 12-120.02. Plaintiffs assert that the four geographic voting districts created by the statute violate the Free and Equal Elections Clause and the Equal Privileges and Immunities Clause of the Arizona Constitution. *See* Ariz. Const. art. 2, §§ 13, 21. For the reasons stated below, we conclude that § 12-120.02 does not violate these constitutional provisions.[1]

## BACKGROUND

### I.

¶2		At statehood, the Arizona Constitution did not contemplate an intermediate court of appeals. Ariz. Const. art. 6, § 1 (amended 1960) ("The judicial power of the State shall be vested in a supreme court, superior court, justices of the peace, and such courts inferior to the superior courts as may be provided by law."); The Records of the Arizona Constitutional Convention of 1910, at 1409 (John S. Goff ed., 1991).

¶3		In 1960, voters passed the "Modern Courts Amendment," which revised article 6 of the Arizona Constitution and gave the Legislature power to establish an intermediate appellate court. *See* Ariz. Sec'y of State, 1960 Publicity Pamphlet 7, 14 (1960); Ariz. Const. art. 6, § 30 (1960) ("Other courts of record may be established by law . . . ."); Ariz. Const. art. 6, § 1 ("The judicial power shall be vested in an integrated judicial department consisting of a supreme court, *such intermediate appellate courts as may be*

———————

[1]	Plaintiffs argued that the superior court erred in concluding that mandamus relief was not a proper remedy. Given our disposition on the constitutional questions, we need not address the propriety of this remedy.

*provided by law*, a superior court, such courts inferior to the superior court as may be provided by law, and justice courts." (emphasis added)); *see also* Ariz. Const. art. 6, § 9 ("The jurisdiction, powers, duties and composition of any intermediate appellate court shall be as provided by law.").

**¶4**　　　　In 1964, pursuant to that constitutional authority, the Legislature established the court of appeals and set forth laws governing its jurisdiction, powers, duties, and composition. *See* 1964 Ariz. Sess. Laws ch. 102, § 1 (2d Reg. Sess.); A.R.S. § 12-120(A) ("A court of appeals is established and constitutes a single court and such court shall be a court of record."); A.R.S. §§ 12-120.01 to -120.32. One such law was § 12-120.02, governing the election of court of appeals judges. *See* 1964 Ariz. Sess. Laws ch. 102, § 1 (2d Reg. Sess.).

**¶5**　　　　When the court of appeals was established, "all of Arizona's state judges were elected by popular vote." *Dobson v. State ex rel. Comm'n on App. Ct. Appointments*, 233 Ariz. 119, 121 ¶ 2 (2013). At the time, supreme court justices were elected "by the qualified electors of the state," Ariz. Const. art. 6, § 4 (1960), and superior court judges were elected "by the qualified electors of their counties," Ariz. Const. art. 6, § 12 (1960). *See* Ariz. Sec'y of State, 1960 Publicity Pamphlet 8–9 (1960). For the court of appeals, the Legislature created four geographic voting districts from which judges would be elected: (1) Maricopa County; (2) all other counties in division 1; (3) Pima County; and (4) all other counties in division 2.[2] *See* A.R.S. § 12-120.02 (1964); 1964 Ariz. Sess. Laws ch. 102, § 1 (2d Reg. Sess.). These same four geographic voting districts still exist today. *Compare* 1964 Ariz. Sess. Laws ch. 102, § 1 (2d Reg. Sess.) *with* § 12-120.02.

**¶6**　　　　It was not until 1974 that "Arizona voters approved Proposition 108, which amended the Arizona Constitution and introduced merit selection into Arizona's judicial selection process." *Dobson*, 233 Ariz. at 121 ¶ 2. Proposition 108 amended article 6, sections 3, 4, 12, 20, 28, 30, and 35, and added article 6, sections 36 through 40 to the Constitution. *See* Ariz. Sec'y of State, 1974 Publicity Pamphlet 25–26 (1974). The amendment to article 6, section 30 explicitly named the court of appeals as a court of

---

2　Division 1 consists of Maricopa, Yuma, La Paz, Mohave, Coconino, Yavapai, Navajo and Apache counties. Division 2 consists of Pima, Pinal, Cochise, Santa Cruz, Greenlee, Graham and Gila counties. A.R.S. § 12-120 (C), (D).

record and added that "[a]ll justices and judges of courts of record," with certain exceptions, "shall be appointed in the manner provided in section 37 of this article." *See id.* at 26.

¶7        While the implementation of merit selection replaced the contested election of judges with gubernatorial appointment, judges are still held directly accountable to the public under the merit selection system through noncompetitive, nonpartisan retention elections. *See* Ariz. Const. art. 6, § 38; John M. Roll, *Merit Selection: The Arizona Experience*, 22 Ariz. St. L.J. 837, 845 (1990). Article 6, section 38 sets forth the procedures governing retention elections. First, a "justice or judge of the supreme court or an intermediate appellate court" must file "a declaration of his desire to be retained in office" before "the expiration of his term of office." Ariz. Const. art. 6, § 38(A). The secretary of state must then "certify to the several boards of supervisors the appropriate names of the candidate or candidates appearing on such declarations filed in his office." *Id.* The names of the judges running for retention then appear "on the appropriate official ballot at the next regular general election," as a yes or no question on whether the judge should be retained in office. *Id.* § 38(B). If a judge "fails to file a declaration of his desire to be retained in office," *id.* § 38(E), or if "a majority of those voting on the question votes 'No'" on retaining the judge, *id.* § 38(C), then the judge's "office shall become vacant." *Id.* § 38(E).

¶8        The first judicial retention election was held in 1976. *See* A. John Pelander, *Judicial Performance Review in Arizona: Goals, Practical Effects and Concerns*, 30 Ariz. St. L.J. 643, 656–57 (1998); Roll, *supra* ¶ 7 at 881. Section 12-120.02 remained largely unchanged[3] until 1994, when the Legislature added the words "for retention." *See* 1994 Ariz. Sess. Laws ch. 245, § 3 (2d Reg. Sess.). But the voting scheme established by § 12-120.02 has remained unchanged since the court of appeals' conception in 1964. *Compare* 1964 Ariz. Sess. Laws ch. 102, § 1 (2d Reg. Sess.) *with* § 12-120.02. Currently, § 12-120.02 provides:

---

[3] The Legislature amended § 12-120.02 several times to reflect expansions to the court. *See* 1969 Ariz. Sess. Laws ch. 48, § 3 (1st Reg. Sess.); 1973 Ariz. Sess. Laws ch. 147, § 5 (1st Reg. Sess.); 1981 Ariz. Sess. Laws ch. 185, § 3 (1st Reg. Sess.); 1984 Ariz. Sess. Laws ch. 198, § 2 (2d Reg. Sess.); 1988 Ariz. Sess. Laws ch. 38, § 3 (2d Reg. Sess.); *see also* 2022 Ariz. Sess. Laws ch. 310, § 3 (2d Reg. Sess.).

**A.** In division 1, of the nineteen judges, ten of the judges shall be residents of and elected for retention from Maricopa county, five of the judges shall be residents of the remaining counties in the division and shall be elected for retention by the voters of the counties in division 1, excluding Maricopa county, and four of the judges shall be at-large judges and be residents of any county in the division. If an at-large judge is a resident of Maricopa county, the judge shall be elected for retention by the voters of Maricopa county. If an at-large judge is not a resident of Maricopa county, the judge shall be elected for retention by the voters of the counties in division 1, excluding Maricopa county.

**B.** In division 2, of the nine judges, four of the judges shall be residents of and elected from Pima county, two of the judges shall be residents of the remaining counties in the division and shall be elected by the voters of the counties in division 2, excluding Pima county, and three of the judges shall be at-large judges and be residents of any county in the division. If an at-large judge is a resident of Pima county, the judge shall be elected for retention by the voters of Pima county. If an at-large judge is not a resident of Pima county, the judge shall be elected for retention by the voters of the counties in division 2, excluding Pima county.

## II.

¶9  Plaintiffs Bonnie Knight, Deborah McEwen, Sarah Ramsey, and Leslie White are registered Arizona voters each residing in different geographic voting districts under § 12-120.02. In January 2024, Plaintiffs filed a special action complaint against Arizona Secretary of State Adrian Fontes and the State of Arizona (collectively, the "State"). Plaintiffs alleged that § 12-120.02 violates the Free and Equal Elections Clause and the Equal Privileges and Immunities Clause of the Arizona Constitution. Specifically, Plaintiffs argued that because the court of appeals "issues appellate decisions and opinions that are binding statewide," voters statewide should be permitted to participate in a court of appeals judge's retention election rather than limiting participation to only the voters who live in the judge's county of residence and, in certain instances, other counties within the

applicable division.  Plaintiffs sought declaratory and injunctive relief and specifically asked the court to order the Secretary of State to certify that all court of appeals judges up for retention in 2024 be placed on the ballot statewide.

¶10     The State moved to dismiss the complaint, arguing that Plaintiffs lacked standing, the statute is constitutional, and mandamus is an improper remedy.  Plaintiffs then moved for summary judgment, but the court held the motion in abeyance until it ruled on the motion to dismiss.

¶11     After oral argument, the superior court granted the State's motion to dismiss.  First, the court held that § 12-120.02 does not violate the Free and Equal Elections Clause.  It noted that "there are no allegations about votes not being properly counted, ballot access restrictions, intimidation or threats of violence, or any other influence that would deter a voter from exercising free will, or that each vote is not given the same weight as every other ballot."  Accordingly, the court only addressed Plaintiffs' argument that the statute treats voters unequally by denying them the right to vote in some court of appeals retention elections.  The court explained that because "[n]o voter is completely denied the right to vote," the issue is whether the current retention election scheme under § 12-120.02 is "equal" under the Free and Equal Elections Clause.  The court rejected Plaintiffs' argument that the "statewide jurisdiction" of the court of appeals mandates a statewide electorate, reasoning that the Constitution's design provides that not all voters will get to vote on all judges.  *See* Ariz. Const. art. 6, §§ 3, 13, 20.

¶12     The court also held that the statute did not violate the Equal Privileges and Immunities Clause.  Relying on *Craven v. Huppenthal*, 236 Ariz. 217, 220 (App. 2014), the court determined that it "need not reach or decide whether the [s]tatute withstands any scrutiny, rational basis or strict" because the statute "treats all similarly situated voters in their respective counties equally" and no "class is treated differently from another similarly situated class."  Finally, the superior court held that mandamus relief was improper and that it need not address standing.  Plaintiffs timely appealed.

¶13     We granted Plaintiffs' petition to transfer the appeal from the court of appeals pursuant to Arizona Rules of Civil Appellate Procedure

19(a). We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

**DISCUSSION**

**¶14** "We review the dismissal of a complaint under Rule 12(b)(6) de novo." *Satamian v. Great Divide Ins. Co.*, 257 Ariz. 163, 169 ¶ 10 (2024). Dismissal is appropriate if "as a matter of law . . . plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof." *CVS Pharmacy, Inc. v. Bostwick*, 251 Ariz. 511, 515–16 ¶ 10 (2021) (alteration in original) (quoting *Fid. Sec. Life Ins. Co. v. Ariz. Dep't of Ins.*, 191 Ariz. 222, 224 ¶ 4 (1998)). Finally, this Court reviews legal and constitutional questions de novo. *Fann v. State*, 251 Ariz. 425, 432 ¶ 17 (2021).

**¶15** Plaintiffs argue that § 12-120.02 violates the Free and Equal Elections Clause, Ariz. Const. art. 2, § 21, and the Equal Privileges and Immunities Clause, Ariz. Const. art. 2, § 13. Before considering these claims, we address the State's argument that Plaintiffs lack standing. The State argues that Plaintiffs have not suffered a concrete and particularized injury. We disagree. There are circumstances where this Court is more likely to require an aggrieved party to show a particularized injury to establish standing, such as in disputes among branches of government. *See Montenegro v. Fontes*, 576 P.3d 692, 699 ¶ 28 (Ariz. 2025). Nevertheless, "[i]n Arizona, standing is a prudential consideration rather than a jurisdictional one." *Biggs v. Cooper ex rel. County of Maricopa*, 236 Ariz. 415, 418 ¶ 8 (2014); *State v. B Bar Enters., Inc.*, 133 Ariz. 99, 101 n.2 (1982) ("Arizona has no analog to the case or controversy provision in its [C]onstitution, and our reluctance to consider issues raised where there is no standing is solely a rule of judicial restraint."). Though we are not bound by federal standing jurisprudence, we regard it as instructive. *Bennett v. Napolitano*, 206 Ariz. 520, 524 ¶ 22 (2003); *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 280 ¶ 36 (2019).

**¶16** Plaintiffs here allege an impairment or denial of their right to vote. The "right to vote is 'individual and personal in nature,'" and alleging impairment or denial of this right gives rise to standing. *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)); *Baker v. Carr*, 369 U.S. 186, 207–08 (1962) (concluding that vote dilution is a redressable injury); A.R.S. § 12-1832 ("Any person . . . whose rights . . . are affected by a statute . . . may have determined any question of . . . validity

7

arising under the . . . statute . . . and obtain a declaration of rights . . . thereunder."). Standing to bring a constitutional claim does not depend on the ultimate success of that claim. *Baker*, 369 U.S. at 207–08; *Montenegro*, 576 P.3d at 700 ¶ 38. If § 12-120.02 violates the Constitution by impairing the right to vote, Plaintiffs are among those who would be injured by such violation. *See Baker*, 369 U.S. at 208. Moreover, we are inclined to address the merits of this case because it presents a "question of great public importance," *Fraternal Order of Police Lodge 2 v. Phx. Emp. Rel. Bd.*, 133 Ariz. 126, 127 (1982), that involves "a dispute at the highest levels of state government," *Rios v. Symington*, 172 Ariz. 3, 5 (1992); *see also Goodyear Farms v. City of Avondale*, 148 Ariz. 216, 217 n.1 (1986).

## I.  Free and Equal Elections Clause

¶17      "[W]here the [C]onstitution specifically addresses the particular subject at issue, we must address that specific provision first. . . . We need not resort to the less specific provision unless the argument based upon the more specific fails." *Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 179 Ariz. 233, 238 (1994) (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994)); *Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 199 ¶ 11 (2001). We therefore turn first to Plaintiffs' Free and Equal Elections Clause claim.

¶18      The Free and Equal Elections Clause provides that "[a]ll elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Ariz. Const. art. 2, § 21. Plaintiffs argue that § 12-120.02 violates the Free and Equal Elections Clause in two ways: first, they argue that individual voters are disenfranchised in the retention elections of judges outside their county; second, they argue that the weight and impact of each vote is unequal. Because the Free and Equal Elections Clause has no federal analog and this Court has not previously interpreted the provision, our first task is to determine the meaning of our Constitution's mandate that elections be "free and equal."

¶19      "When interpreting the scope and meaning of a constitutional provision, we are guided by fundamental principles of constitutional construction." *Jett v. City of Tucson*, 180 Ariz. 115, 119 (1994). "The governing principle of constitutional construction is to give effect to the intent and purpose of the framers of the constitutional provision and of the

people who adopted it." *Apache County v. Sw. Lumber Mills, Inc.*, 92 Ariz. 323, 327 (1962). We start with the plain meaning of the constitutional text. *Ariz. Free Enter. Club v. Hobbs*, 253 Ariz. 478, 482 ¶ 10 (2022). We interpret a constitutional provision in its broader context and aim to give effect to every word such that no word or provision is rendered superfluous. *Burns v. Ariz. Pub. Serv. Co.*, 254 Ariz. 24, 30 ¶ 23 (2022). "When the language of a provision is clear and unambiguous, we apply it without resorting to other means of constitutional construction." *Heath v. Kiger*, 217 Ariz. 492, 494 ¶ 6 (2008). But if the language is ambiguous, "we will examine secondary principles to identify the correct interpretation." *State ex rel. Brnovich v. City of Phoenix*, 249 Ariz. 239, 244 ¶ 21 (2020). "Ambiguity occurs when uncertainty exists about the meaning or interpretation of a provision's terms." *Heath*, 217 Ariz. at 494 ¶ 6.

**¶20**　　　　The Arizona Constitution does not define the terms "free" or "equal." "When the Arizona Constitution does not define its terms, we look to their natural, obvious, and ordinary meaning, and our focus is on their meaning at the time the Constitution was adopted." *State v. Mixton*, 250 Ariz. 282, 290 ¶ 33 (2021) (cleaned up). At statehood, "free" was defined as "[u]nconstrained; having power to follow the dictates of his own will," or "[a]vailable to all citizens alike without charge." *Free*, Black's Law Dictionary (2d ed. 1910); *see also Free*, Webster's Practical Dictionary (1910) ("Not under restraint, control or compulsion; . . . unconstrained by timidity or distrust; unrestrained; . . . not obstructed or appropriated."); *Free*, New Websterian (1912) ("[W]ithout restraint; at liberty."). And "equal" was defined as "[a]like; uniform; on the same plane or level with respect to efficiency, worth, value, amount, or rights." *Equal*, Black's Law Dictionary (2d ed. 1910); *see also Equal*, Webster's Practical Dictionary (1910) ("Having the same magnitude, dimensions, value, degree, etc.; . . . equable; not unduly inclining to either side; uniform; fair; just; equitable."); *Equal*, New Websterian (1912) ("[O]f the same extent, or magnitude; uniform; adequate; of the same rank, degree, or value; just; parallel.").

**¶21**　　　　These definitions suggest that a "free" election is one in which voters can exercise their will unconstrained by coercion, physical force, or intimidation, and that an "equal" election is one in which all voters have similar voting rights in kind and quality. This understanding comports with the two Arizona cases that have examined the Free and Equal Elections Clause.

**¶22**　　　　The first Arizona case interpreting this constitutional provision is *Chavez v. Brewer*, 222 Ariz. 309, 319 ¶ 32 (App. 2009). The appellants in *Chavez* alleged that two of the voting machines the Secretary of State selected for use in future elections were inaccessible and unreliable. *Id.* at 313 ¶ 8. Thus, they argued that the Secretary of State's selection of these machines violated the Free and Equal Elections Clause because "requir[ing] some voters to vote on such a flawed and insecure system while others vote on a safer, more accurate system would result in a drastically unequal election." *Id.* at 319 ¶ 30 (alteration in original). Looking to cases from Illinois, Kentucky, and New Mexico, the court of appeals noted:

> Other states with similar constitutional provisions have generally interpreted a "free and equal" election as one in which the voter is not prevented from casting a ballot by intimidation or threat of violence, or any other influence that would deter the voter from exercising free will, and in which each vote is given the same weight as every other ballot.

*Id.* at 319 ¶ 33. Based on these other states' cases, the court of appeals concluded that "Arizona's constitutional right to a 'free and equal' election is implicated when votes are not properly counted." *Id.* at 320 ¶ 34.

**¶23**　　　　The second case dealing with Arizona's Free and Equal Elections Clause is *State ex rel. Brnovich v. City of Tucson*, 251 Ariz. 45, 53 ¶ 33 (2021). The question there was "whether the subject matter of the City's charter and Ordinance—conducting off-cycle municipal elections—is a matter of purely municipal concern or is also one of statewide interest." *Id.* at 49 ¶ 19. As part of its argument that the subject of off-cycle municipal elections was of statewide interest, the state asserted that "low turnouts adversely affect the fundamental right to vote guaranteed by our [S]tate and [F]ederal [C]onstitutions." *Id.* at 52 ¶ 30. While the Free and Equal Election Clause played a minimal role in our decision in *Brnovich*, we stated that "[t]he fundamental right to vote guarantees that voters will 'participate in state elections on an equal basis with other qualified voters,'" and cited to the Free and Equal Elections Clause as additional support for this statement. *Id.* (quoting *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 211 Ariz. 337, 345–46 ¶ 23 (App. 2005), an equal protection case). We further noted that the state "point[ed] to nothing about off-cycle elections that erects barriers to voting or treats voters unequally,"

citing to *Chavez*'s analysis of other states' cases as authority. *Brnovich*, 251 Ariz. at 52 ¶ 30. Thus, we rejected the state's argument because low voter turnout "does not deprive those voters of their constitutional right to vote." *Id.*

**¶24** Arizona is not the only state with a Free and Equal Elections Clause in its Constitution. The Washington constitution was adopted in 1889 and contains a provision identical to Arizona's Free and Equal Elections Clause. *See* Wash. Const. art. I § 19 ("All elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."). And this Court has stated that "if the provisions of another state's constitution are similar in nature and meaning to provisions in Arizona's Constitution, then the decisions of the judiciary in those states should be considered 'very persuasive' in interpreting Arizona's similar provision." *Dickey ex rel. Dickey v. City of Flagstaff*, 205 Ariz. 1, 4 ¶ 16 (2003) (quoting *Faires v. Frohmiller*, 49 Ariz. 366, 372 (1937)); *see also State v. Soto-Fong*, 250 Ariz. 1, 11 ¶ 43 (2020); *Barth v. White*, 40 Ariz. 548, 551 (1932); *State v. Osborn*, 16 Ariz. 247, 250 (1914).

**¶25** In Washington, the court of appeals is divided into districts made up of one or more counties, and each of these districts elects a set number of judges to the court of appeals, similar to the way Arizona's court of appeals is structured. *Compare* Wash. Rev. Code §§ 2.06.020, 2.06.070, 2.06.075, and 2.06.076 *with* A.R.S. § 12-120.02. In *Eugster v. State*, 259 P.3d 146, 147–48 ¶ 1 (Wash. 2011), the appellant argued that Washington's process of electing its court of appeals judges violated the state constitutional provision requiring that "[a]ll [e]lections shall be free and equal." In rejecting appellant's claim, the Washington Supreme Court concluded that its "cases have never held that [the free and equal elections clause] requires substantial numerical equality between voting districts." *Id.* at 150 ¶ 10. Rather, the supreme court has interpreted Washington's free and equal elections provision as "prohibiting the complete denial of the right to vote to a group of affected citizens" and concluded that there was no constitutional violation because "every Washington voter has the opportunity to vote for at least one Court of Appeals judge." *Id.*; *City of Seattle v. State*, 694 P.2d 641, 647 (Wash. 1985) (noting that the provision "require[s] that otherwise qualified voters who are significantly affected by the results of an election be given an opportunity to vote in that election").

¶26 Likewise, we conclude that the Free and Equal Elections Clause is implicated when voters are disenfranchised, *see Eugster*, 259 P.3d at 150 ¶ 10; *Brnovich*, 251 Ariz. at 52 ¶ 30, or when votes are given unequal weight, *see Chavez*, 222 Ariz. at 319 ¶ 33.

## A.

¶27 Plaintiffs argue that § 12-120.02 disenfranchises Arizona voters by denying them "the right to vote on the retention of Court of Appeals judges with appellate jurisdiction over them." This argument alleges, for example, that because residents of Yuma County cannot vote on the retention of court of appeals judges residing in Pima County, residents of Yuma County are disenfranchised as to the retention election of each court of appeals judge residing in Pima County that may decide matters affecting Yuma County residents.

¶28 As noted above, the Free and Equal Elections Clause is implicated when there is a "complete denial of the right to vote." *See Eugster*, 259 P.3d at 150 ¶ 10. Plaintiffs' disenfranchisement argument thus presumes that there is an underlying right to vote in *every* court of appeals judge's retention election. *See Arizonans for Second Chances, Rehabilitation, & Pub. Safety v. Hobbs*, 249 Ariz. 396, 414 ¶ 66 (2020) (refuting the notion that the decision "disenfranchises Arizonans from voting in initiative elections" because there is no "right to vote on *every* initiative"); *Disenfranchisement*, Black's Law Dictionary (12th ed. 2024) ("The act of taking away the *right to vote* in public elections from a citizen or class of citizens." (emphasis added)). While it is true that the right to vote for judges is deeply rooted in Arizona's history, *see Ariz. Free Enter. Club*, 253 Ariz. at 491 ¶ 46 & n.6 (Montgomery, J., dissenting) (detailing this history), and the Constitution acknowledges that court of appeals judges must stand for retention, *see* Ariz. Const. art. 6, § 38(A), Plaintiffs point to no constitutional provision that guarantees a right to vote for *every* court of appeals judge.

¶29 Plaintiffs make several arguments as to why "statewide jurisdiction" should require statewide retention. For example, court of appeals decisions have statewide precedential value that impacts all citizens of the state; a party appearing before the court of appeals may have their case decided by judges outside their voting district who they cannot vote to retain, *see* A.R.S. § 12-120(E); and the Arizona Court of Appeals, Division One is statutorily tasked with handling all appeals from the tax

court, *see* A.R.S. § 12-170(C), and the industrial commission, *see* A.R.S. § 12-120.21(B), regardless of where the parties reside. While these may be compelling policy arguments, they carry no constitutional significance. Nothing in the Constitution suggests that a judge's jurisdiction over an individual gives that individual an affirmative right to vote for that judge.

**¶30**       In fact, adopting this rationale would contradict other constitutional provisions that assign retention elections based on geographical boundaries or authorize judges to serve without participating in a retention election. *See* Ariz. Const. art. 6, §§ 3, 20. For example, article 6, section 20 provides that "[a]ny retired justice or judge of any court of record who is drawing retirement pay may serve as a justice or judge of any court." And article 6, section 3 provides that the chief justice "may assign judges of intermediate appellate courts, superior courts, or courts inferior to the superior court to serve in other courts or counties." A retired or visiting judge serving as a court of appeals judge is not subject to retention and yet exercises "statewide jurisdiction." Thus, the Constitution does not require that *every* judge serving on the court of appeals must stand for retention before *every* voter.

**¶31**       Moreover, Arizona superior courts "constitute a single court, composed of all the duly elected or appointed judges in each of the counties of the state," Ariz. Const. art. 6, § 13, and constitute a "single unified trial court of general jurisdiction," *Marvin Johnson, P.C. v. Myers*, 184 Ariz. 98, 102 (1995), just as the court of appeals "constitutes a single court," A.R.S. § 12-120(A). Indeed, "[t]he judgments, decrees, orders and proceedings of any session of the superior court held by one or more judges shall have the same force and effect as if all the judges of the court had presided," and "[t]he process of the court shall extend to all parts of the state." Ariz. Const. art. 6, § 13. However, superior court judges serving in counties with a population of 250,000 are "subject to retention or rejection by a vote of the qualified electors *of the county from which they were appointed*." Ariz. Const. art. 6, § 37(B) (emphasis added).

**¶32**       "We do not read separate constitutional provisions to determine which prevails over the other; rather, we read them to harmonize the provisions and give effect to each." *Burns*, 254 Ariz. at 31 ¶ 30. Harmonizing these constitutional provisions leads us to reject Plaintiffs' assertion that a judge's statewide jurisdiction mandates a right to vote in all court of appeals judicial retention elections.

**¶33**        Plaintiffs additionally argue that because article 6, section 38 requires court of appeals judges, like supreme court justices, to file their judicial retention form with the secretary of state—a statewide elected officer—the Constitution thus "makes it very clear" that court of appeals judges must stand for statewide retention. *See* Ariz. Const. art. 6, § 38(A). Not so.

**¶34**        Plaintiffs overstate the significance of the retention filing forum.  The office where a judge must file his or her retention form—whether the secretary of state's office or the clerk of the board of supervisors in the county where the superior court sits—at best provides an anecdotal inference of statewide jurisdiction.  When voters passed the initiative adding article 6, section 38 to the Constitution in 1974, the geographic voting districts in § 12-120.02 had already been in place for ten years. *See supra* ¶¶ 5–6.  We presume that voters were aware of how court of appeals judges were elected when they passed the initiative adding article 6, section 38 to the Constitution. *Cf. Daou v. Harris*, 139 Ariz. 353, 357 (1984) ("[W]e presume that the [L]egislature, when it passes a statute, knows the existing laws.").  Section 38 does not carry the weight Plaintiffs assign it, and we decline to rest our constitutional interpretation on such inferences.  It is just as likely that court of appeals judges are required to file their retention paperwork with the secretary of state for administrative convenience—for a judge standing for retention in multiple counties, as several court of appeals judges do, filing a judicial retention form with the secretary of state provides the most efficient way to proceed.

**¶35**        Without an identifiable right to vote in every court of appeals judicial retention election, there is no viable claim of disenfranchisement. No voter is denied the right to vote in the retention elections of judges within their geographic district.  Therefore, Plaintiffs' disenfranchisement argument fails.

**B.**

**¶36**        Plaintiffs additionally argue that "voters are treated unequally with regard to the weight and impact of their votes on the Court of Appeals as a whole."  Specifically, Plaintiffs allege that "the number of judges in each of the two divisions is not equal," the judges within each division "are not equally distributed between urban and rural areas," and

"the voting population is not equally distributed throughout the four areas."  As previously explained, the Free and Equal Elections Clause is implicated when votes are not given the same weight.  *See supra* ¶¶ 18–26; *see also Brnovich*, 251 Ariz. at 52 ¶ 30; *Chavez*, 222 Ariz. at 319 ¶ 33.

¶37        While Plaintiffs maintain that this is not an apportionment claim, the argument that votes are given unequal weight is, at bottom, a vote dilution claim rooted in the one-person, one-vote apportionment principle, and we address it as such.  *See Hadley v. Junior Coll. Dist.*, 397 U.S. 50, 55 (1970) (noting that the "right to equal voting participation is impaired" when "one person's vote is given less weight through unequal apportionment"); *Chisom v. Roemer*, 501 U.S. 380, 402 n.31 (1991) ("The 'one-person, one-vote' principle . . . has been interpreted to mean that 'each person's vote counts as much, insofar as it is practicable, as any other person's.'" (quoting *Hadley*, 397 U.S. at 54)); *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

¶38        The one-person, one-vote apportionment principle as applied to state and local elections arises out of the Federal Equal Protection Clause, which guarantees that in all popular elections for representative government officials, each vote will be given "substantially equal weight." *Avery v. Midland County*, 390 U.S. 474, 476, 478 (1968); *Reynolds*, 377 U.S. at 568 ("The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens . . . ."); *Hadley*, 397 U.S. at 56 (explaining that the "general rule" is that one-person, one-vote apportionment is required "whenever a state or local government decides to select persons by popular election to perform governmental functions"). In apportionment controversies, "[p]opulation is, of necessity, the starting point for consideration and the controlling criterion for judgment." *Reynolds*, 377 U.S. at 567; *Avery*, 390 U.S. at 478–79 (holding that the Equal Protection Clause "forbids the election of local government officials from districts of disparate population").

¶39        However, the United States Supreme Court has acknowledged that the one-person, one-vote apportionment principle does not apply to judicial elections.  *See Wells v. Edwards*, 347 F. Supp. 453, 454–55 (M.D. La. 1970) ("[W]e hold that the concept of one-man, one-vote apportionment does not apply to the judicial branch of the government."),

*aff'd*, 409 U.S. 1095 (1973); *Chisom*, 501 U.S. at 402 (stating that "we have held the one-person, one-vote rule inapplicable to judicial elections" in the context of "a constitutional challenge based on the Equal Protection Clause of the Fourteenth Amendment") (citing *Wells*, 347 F. Supp. at 454); *id.* at 415 (Scalia, J., dissenting) ("[W]e ha[ve] held that the principle of 'one person, one vote' does not apply to the election of judges." (citing *Wells*, 347 F. Supp. 453)).

**¶40**        In *Wells*, a registered Louisiana voter filed suit "seeking a reapportionment of the judicial districts from which the seven Justices of the Supreme Court of the State of Louisiana are elected . . . in accordance with the one-man, one-vote principle." 47 F. Supp. at 454. The court explained that "the rationale behind the one-man, one-vote principle . . . evolved out of efforts to preserve a truly representative form of government" and ensures that "each official member of an elected body speaks for approximately the same number of constituents." *Id.* at 455. Because judges are not "representatives," as Plaintiffs concede, the one-person, one-vote apportionment principle "is simply not relevant to the makeup of the judiciary." *Id.*; *Chisom*, 501 U.S. at 411 (Scalia, J., dissenting) ("It is precisely because we do not *ordinarily* conceive of judges as representatives that we held judges not within the Fourteenth Amendment's requirement of 'one person, one vote.'" (citing *Wells*, 347 F. Supp. 453)). Thus, under the rationale in *Wells*, we conclude one-person, one-vote does not apply to judicial retention elections under Arizona's merit selection system.

**¶41**        Additionally, as noted above, neither the text nor the history of Arizona's Free and Equal Elections Clause supports Plaintiffs' claim that they have the right to vote in all judicial retention elections for judges that exercise statewide jurisdiction, and Plaintiffs do not provide any case law that supports this claim. Moreover, applying this argument to article 2, section 21 would ignore or contradict other constitutional provisions that assign retention elections based on geographical boundaries and authorize judges to serve on the court of appeals without needing to participate in retention elections. *See* Ariz. Const. art. 6, §§ 3, 20.

**¶42**        In sum, the electorate for court of appeals retention elections need not be statewide because there is no underlying right to vote in every court of appeals judge's retention election, and thus the mere creation of geographic voting districts does not disenfranchise any voter. Geographic

voting districts, once created, do not have to be apportioned based on population because the one-person, one-vote principle does not apply to the judiciary. Therefore, Plaintiffs' claim under the Free and Equal Elections Clause fails.

## II. Equal Privileges and Immunities Clause

**¶43** We turn next to the Plaintiffs' claim based on the Equal Privileges and Immunities Clause. Arizona's Equal Privileges and Immunities Clause provides: "No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." Ariz. Const. art. 2, § 13. While we acknowledge that article 2, section 13 textually differs from the Equal Protection Clause in the Fourteenth Amendment, *see* U.S. Const. amend. XIV, § 1, we have construed our state provision "as applying the same standard as applies to equal protection claims under the [F]ederal [C]onstitution." *Coleman v. City of Mesa*, 230 Ariz. 352, 361 ¶ 39 (2012); *Valley Nat'l Bank of Phx. v. Glover*, 62 Ariz. 538, 554–55 (1945) ("The [E]qual [P]rotection [C]lauses of the 14th Amendment and the [S]tate [C]onstitution have for all practical purposes the same effect."); *see also Chavez*, 222 Ariz. at 320 ¶ 35; *Ariz. Minority Coal. for Fair Redistricting*, 211 Ariz. at 345 n.10.

**¶44** To establish an Equal Privileges and Immunities violation under the Arizona Constitution, a party must first establish "that it was treated differently than those who are similarly situated." *Waltz Healing Ctr., Inc. v. Ariz. Dep't of Health Servs.*, 245 Ariz. 610, 616 ¶ 24 (App. 2006). Stated another way, "[e]qual protection guarantees are satisfied 'if all persons in a class are treated alike.'" *Craven v. Huppenthal*, 236 Ariz. 217, 220 ¶ 16 (App. 2014) (quoting *Ariz. State Tax Comm'n v. Frank Harmonson Co. Metal Prods.*, 63 Ariz. 452, 459 (1945)). "The [E]qual [P]rotection [C]lauses of the [F]ederal and [S]tate [C]onstitutions do not prohibit all inequality of treatment, but only require that all persons in a given class be treated equally and that the classification be reasonable and not arbitrary or capricious." *Shelby Sch. v. Ariz. State Bd. of Educ.*, 192 Ariz. 156, 169 ¶ 65 (App. 1998).

**¶45** Plaintiffs argue that the classification created by § 12-120.02 violates the Equal Privileges and Immunities Clause because it "discriminates among voters based on residency" such that "the right to

vote in retention elections for the Court of Appeals does 'not equally belong to all citizens.'" But as we have already explained, there is no constitutional right to vote in every court of appeals judge's retention election. *See supra* ¶¶ 28–35. Because there is no underlying right to vote in every court of appeals retention election, Plaintiffs' Equal Privileges and Immunities claim must rise or fall on an assertion that § 12-120.02 creates a classification based on residency, treats members of classes differently, and that such difference in treatment is constitutionally prohibited.

¶46 Section 12-120.02 classifies individuals based on residency and treats classes of individuals differently insofar as it affords an opportunity to vote on a greater or lesser number of court of appeals judges according to residency. For example, under § 12-120.02(A), depending on the composition of the court, residents of Maricopa County get to vote in the retention election of from ten to fourteen court of appeals judges, while residents of the remaining counties in division 1 get to vote for from five to nine court of appeals judges. *See supra* ¶ 8. "However, it is not always a denial of equal protection when the state treats different classes of individuals in different ways." *Big D Constr. Corp. v. Court of Appeals*, 163 Ariz. 560, 565 (1990); *see also, e.g.*, *Personnel Adm'r v. Feeney*, 442 U.S. 256, 271 (1979) ("The equal protection guarantee of the Fourteenth Amendment does not take from the States all power of classification."); *Romer v. Evans*, 517 U.S. 620, 631 (1996) ("The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons.").

¶47 As observed previously, *see supra* ¶ 42, the Legislature has broad powers to establish voting districts for the court of appeals retention elections because one-person, one-vote principles do not apply to the judiciary. *See* Ariz. Const. art. 6, § 9 ("The jurisdiction, powers, duties and composition of any intermediate appellate court shall be as provided by law."); *id.* art. 4, pt. 1, § 1. At bottom, Plaintiffs' claims of differential treatment are rooted in one-person, one-vote principles which do not apply to the judiciary and thus cannot be used to show differential treatment. Moreover, the United States Supreme Court has held that "the Equal Protection Clause relates to equality between persons as such, rather than between areas and that *territorial uniformity is not a constitutional prerequisite*." *McGowan v. Maryland*, 366 U.S. 420, 427 (1961) (emphasis added); *see also Missouri v. Lewis*, 101 U.S. 22, 31 (1879) (reasoning that equal

protection under the Fourteenth Amendment "means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances").

**¶48**     Section 12-120.02 treats all voters within a geographic voting district the same way. *See City of Tucson v. Pima County*, 199 Ariz. 509, 518 ¶¶ 28–29 (App. 2001) (concluding that requiring communities in "urbanized areas" to get the City's consent to hold an election did not violate the Equal Protection Clause because "[a]ll persons within the area which is the object of incorporation [were] treated equally"). Here, all voters are similarly restricted to voting for judges based on geography rather than jurisdiction, and simply being affected by a judge's authority does not create the right to vote for that judge's retention. *See Wells*, 347 F. Supp. at 455–56. Thus, because all voters within a geographic voting district are similarly situated and treated equally, § 12-120.02 does not violate Arizona's Equal Privileges and Immunities Clause. Additionally, because the Plaintiffs did not allege that § 12-120.02 treats voters within separate voting districts differently, or voters within one voting district differently, they failed to allege a constitutional violation, and we need not subject the statute to any form of scrutiny.

**¶49**     Given the Legislature's broad powers to dictate the "jurisdiction, powers, duties and composition" of the court of appeals, *see* Ariz. Const. art. 6, § 9, we do not lightly interfere with the voting districts established by the Legislature over sixty years ago that have been in place since the creation of the court of appeals. *See Matthews v. Indus. Comm'n*, 254 Ariz. 157, 163 ¶ 29 (2022); *Seisinger v. Siebel*, 220 Ariz. 85, 92 ¶ 26 (2009) ("The [L]egislature has plenary power to deal with any topic unless otherwise restrained by the Constitution."); Ariz. Const. art. 4, pt. 1, § 1.

**CONCLUSION**

**¶50**     For the foregoing reasons, we affirm the superior court's order dismissing the claim.